May it please the court, there are three reasons that this court should reverse the District Court's denial of suppression in this case. First, Mr. Myers, a passenger in a routine traffic stop, should have been allowed to leave the traffic stop when he asked to do so. Second, Mr. Myers was initially searched and not frisked and there was no probable cause to do so. Third, the strip search of Mr. Myers was unreasonable and therefore unconstitutional. I'd like to start by discussing why a passenger in a routine traffic stop should be allowed to leave when there is no reasonable suspicion that he has committed a crime. We know from Terry that officers must have a reasonable suspicion to stop someone. Can you start with Arizona v. Johnson? Yes, Your Honor. Because you didn't cite it in your brief. Yes, Your Honor. So the distinction for our case in Arizona v. Johnson, I'll admit it is a fine distinction. And the facts in Arizona v. Johnson, there's a normal traffic stop and the officer testifies there's no reasonable suspicion that anybody had committed a crime when they stopped the car. However, during her interactions with the eventual defendant in the case, she noticed that he kept looking back at her, that he had gang clothing on, that he had a scanner on him, that he had no identification, that he lived in a gang area, and that he had served time for burglary. The distinction here is that when Mr. Myers was seized, first of all, we don't believe that there was reasonable suspicion to continue to detain him at the moment that he asks to leave, which is only one minute and ten seconds into the stop. The reason this case is different is Mr. Myers, when he asked that question, he no longer was acquiescing to the government's authority to detain him. In Brenlin, the case that gave standing to passengers to challenge for the amendment violations for being stopped in cars, there was a discussion about the reason that the court found that passengers were detained had to do with the fact that they were acquiescing to the officer's show of authority. In this case, Mr. Myers, at least initially did so, he didn't jump out of the car right away, but he did ask to leave. But Arizona is pretty clear that the temporary seizure of a passenger during a traffic stop is presumptively reasonable for the duration of the stop, so I'm still not entirely sure that you've articulated the distinction that the Supreme Court seems to find significant. That's okay. So I think that the problem really goes back before Arizona v. Johnson. It goes back to Maryland v. Wilson. That's the case where initially the Supreme Court examined whether or not an officer can order a passenger out of a car, and the court found that it could. Now, I went back and listened to the oral argument in that case, and the justices had a lot of concern. Almost half of the oral argument was discussed about, well, where's the line? Does it just stop there? Or can an officer detain someone without reasonable suspicion at a traffic stop indefinitely throughout that traffic stop? In fact, I think it's note three of that decision. The majority recognizes that they are not answering that question and that it is still an open question. We don't think that the facts that the holding in Johnson forecloses that. I don't think that it goes to the point where a person who has been seized requests to leave. Because in Johnson, Mr. Johnson did not request to leave at any point. He did not make any indication that he was no longer submitting to the officer's authority for the traffic stop as a passenger. Right, because the presumption would be there because there's no negative expression that he didn't want to be there. In your case, it was. Yes, he made it very clear. He asked to leave, and he said, I'm the passenger, can I go on? Right, because normally people are just sitting there as passengers. It never comes up. You're just there, and the police officer says, well, that's fine. Just sit tight. But he said at the very beginning, I want to get out. He made it clear. The police officer said, no, you can't get out. Stay there. That's correct. The Supreme Court said that the stop communicates to a reasonable passenger that he or she is not free to terminate the encounter and move about at will. So Johnson didn't seem to care whether or not the passenger said, I won't leave. Well, it wasn't, and I understand your point, Your Honor, but that wasn't the facts in Johnson either. I'm just reading from what the. Yeah, of course, and to be candid, most of the circuit courts, including this court that has looked at that question, have not answered that question that would benefit in a way that would benefit my client. But I do think that this presents a very clear opportunity for this court to examine, you know, what is it when a passenger asks to leave and there's no reason to hold him there, why is it that we should keep him there? But why would you say that there is no reason to hold him at that point when, because of the articulated concern that when the two of them are in the car, they are in the officer's line of sight. And this is the passenger that it turned out had a gun. So until some establishment of what's going on is made, why would it not be, the officer is entitled, and I think there is language in Johnson that the passenger is not free to depart without police permission. And it is permitted to pat the defendant down for safety reasons. And that seems to be precisely what's called into question by the facts here, since the passenger is the one with the gun and his pants. Yeah, I understand the court's concern and, you know, all the courts that have looked at this for officer safety. So there's really two, I think, things I need to address to answer your Honor's question. First is, what reasonable suspicion did that officer have at the moment that Mr. Myers asked to leave? The second issue is officer safety generally, right? But you don't, but that's why I'm having so much trouble. I'm not, I'm a little baffled just why you're arguing Arizona, I mean Johnson, because it just seems, it doesn't seem to me to be as squishy an opinion as you articulated to be. The language is pretty in fact that the temporary seizure of passenger during a traffic stop is presumptively reasonable. Well, I think we certainly have to deal with Johnson, right? I mean, it's clear that's like a leading case on this issue. The issue is of passengers and traffic stops. But our distinction is a significant one in that this is one where Mr. Myers requested to leave. And at the moment that he requested that. So is the officer, under your view of things, required to accept that statement of face value as being true? I mean, for all he knows, the guy gets out of the car, says he wants to leave. He may double back and come behind the officer during the stop. There are all kinds of things that can happen in a so-called routine traffic stop. And that's kind of a, almost an oxymoron, because there's no such thing as a routine traffic stop. The officer engaged in that stop, at any moment the stop could turn into something far from the routine. I mean, the concern here is the officer's safety. And what's unreasonable in allowing the officer to intrude minimally upon the passenger and ensuring, as Judge Duncan pointed out, that they all remain within his or her line of sight? Well, we believe that in this case the officer could have allowed Mr. Myers to leave and observed him walking away from the scene. But not with, not, and also focus, there's one officer in the traffic stop. Yes, Your Honor, at that time. And the officer is saying, I wanted eyes on both of them until I determined what the situation was. And having one of them move away and possibly behind me while I'm communicating with the driver could have, and in fact in this case would have, put the officer at risk. And that's precisely the concern that the Supreme Court in Johnson was addressing. And I think that the officer can still control that passenger's movement as the passenger leaves the scene. He can say, please don't walk behind me. Please don't leave? You're, I'm just not, I think maybe, I think I've made my concern clear. I'm not sure, I don't quite see what in Johnson prevents the officer from doing what the officer did here for his or her own protection, which was the rationale for Johnson. And what I would say, Your Honor, is that the distinction, there were a lot of facts that that officer in Johnson had reason to be concerned for her safety. However, those facts do not exist in this case. He didn't know. I mean, he just at that point did not know. Exactly. And so the point of allowing the detention for the duration of the stop is to allow the officer to know. And the officers, we think that the Fourth Amendment prohibits officers from just figuring things out without, stopping someone and holding them without a reason to do so. I understand Your Honor's concern with that. I think that... Well, it's the Supreme Court's concern. It's everyone's concern. Officer safety is obviously everyone's concern. It's a legitimate weighty interest. But as discussed in Mary Lynn v. Wilson, which is the first passenger case of the Supreme Court, the statistics were unclear at that time about how dangerous particularly traffic stops were. And I think that we have to remember to think about the context here. And I think that the question is, is a routine traffic stop more dangerous to a police officer than a regular interaction on the street? And if there were two people walking down the street and an officer wanted to stop and talk to one and one continued to walk away, an officer would have to have reasonable suspicion to stop that second person from leaving the scene. And there's nothing magical about a routine traffic stop that makes it more dangerous than other interactions that police have every day. But unfortunately for you, the Supreme Court has made the distinction with automobiles and given a sort of special jurisprudence that you have to deal with. Do you think your case falls and rises and falls totally on whether or not when you ask to leave that you refuse or do something further? I think that... Because if there's something further, I might suggest you might want to get to the further. Thank you, Your Honor. Okay. I think that I will move on to the second issue, which is that Mr. Myers was actually searched and not frisked. Okay. We believe that the record is clear that this was a search. It's a search from the very beginning, and it was a search throughout to the end. So at the moment, we can see that there was reasonable suspicion to frisk him once the driver tells that Mr. Myers had a gun. There was reasonable suspicion there, and so he was permitted to frisk him. But this was not a frisk, and the evidence shows that. The officer testified that this was a search pursuant to probable cause, and the officer... When we see on the video the two officers who very first interact with Mr. Myers after there's mention of a gun, they're lifting up his shirt. That is a search, and it is not a frisk. They're not patting down the outside of his clothes. The officer, Officer Wyckoff, is the one who eventually secured the gun. He starts searching in his pockets, and that's what can be clearly seen on the video in this case. So we think that the court analyzed this case inaccurately, and because it did not consider whether or not there was probable cause, to actually do a search, because that's what the officers did. So you don't think there was probable cause for a search at that point? No, Your Honor, we don't. You don't think his fellow driver who's in the car with him saying he has a gun and saying where it was would be probable cause? No, Your Honor. Tell me why not. Well, that is a tip. It's a face-to-face tip, so it's a legitimate tip. It's face-to-face. It's contemporaneous. It's right there in location. He's next to him about two feet away from him. He was in the car before that. I mean, so if you want to go down that line, that's kind of tough. Tell me why that's not probable cause for a search. You're right. It was not a tight, terry-stocked frisk at that point. You're right. Clearly. But why wasn't it probable cause, given the information from his friend or person? The cases that are cited by the government about this, the Saki case, and all of those cases when there's a tip about a man with a gun, all of them hold that there is reasonable suspicion to stop and frisk that person, not that there's probable cause to search. And so that's why we think that probable cause is required. What would have satisfied probable cause under the circumstances? There would need to have been some sort of confirmation. I mean, he should have frisked him instead of searching him. Which I thought he did. The problem, as I recall, the problem was that the gun was in his underwear between his legs. Yes, Your Honor. And we think that that frisk, first of all, it was not a frisk, so it should be evaluated. I'm asking how would, what, he had, what more, once the officer had reason to believe he had a gun, why, I guess, why wasn't it reasonable to try, why was it unreasonable to retrieve the gun? It was not unreasonable to retrieve the gun at that moment. The question at this point is whether or not the officer had probable cause to do a full search, which is what he did in this case. That's our position. I need to address. Do you think that the officer at that point, frisking now, let's go back to frisking. Do you think the officer had the right to do a standard pat down? I mean, the one you really use, you go from the ankle, you go all the way up to the crotch from behind, and you get into that area as opposed to the one, like, chest, outside of your thigh type. I mean, do you think you could do that? Because that's the one that probably would have revealed it, because, you know, you spread your legs, hip goes along, you go all the way up the line, and you, I'm not trying to be graphic about it, but you stretch your hand all the way as far as it can go in the groin area of both sides. That's why you can feel when it's under the scrotum or whatever. That's the purpose of that search. Could he do that? I'm not sure that there's a distinction between frisking. So he said he could. He could do a standard frisk, yes, Your Honor. We don't believe that's what he was doing. Okay, if I could just clarify. And I'm sorry, I'm taking up your time. I'm really not quite clear. What's a standard frisk? I'm not sure that there is. A standard frisk is a pat down for weapons. But that's the distinction you're making, and I guess Judge Berkley's question was, I'm sorry, I've taken up. Please. I'll give him more time. Okay. I'll give him more time. Go ahead. The question is, what is standard in terms of, standard means you don't go inside the pockets to look for contents, but it's a pat down, but they're different types of frisks. Like, you know, you see it more routinely, particularly when people are, you know, against the wall, hands on the wall. In an airport. In an airport, yeah. Inside the eye. I mean, it's a fairly. It's uncomfortable. You guys have had experiences that I yet haven't. You've let it charm you. That's interesting. I think. PSA? Not yet. To answer the question, I think maybe the court's really trying to figure out, was this going to be inevitably discovered? No, no, no, no. I honestly was just trying to understand your, the distinction you were making. And I think all I can say is that I look more like a terrorist than Judge Diaz. All right. No, my experience comes from representing people for years. When you go to see a client who's in prison or incarcerated, they also, they search the lawyer, too, to make sure the lawyer's not bringing in contraband. And it is rather intrusive, certainly. So they don't strip you, but they do make you uncomfortable. Yes, Your Honor. My time is up. I will reserve three minutes, I believe, and I'll talk about. Is there something else you want to say in conclusion? I told you I'd give you some time. Sure. The last issue is that this strip search was unreasonable. Very briefly, we think that it was unreasonable because it's a public place. The officer turned Mr. Myers at some point to face the outside. It's a very well-lit gas station. Mr. Myers' penis was exposed, and at that time a flashlight is being shown upon it. So this is a very significant. Yeah, I saw that video, too. But the thing is that I noticed about the exposure of his private parts, it was more vertical than horizontal. The horizontal would be, like, pull your pants down, everybody. But you could see it because the cam was up and down. So, in other words, it's almost like you pull your pants open, and the person who's looking down at sees, but I don't think anybody who is a distance away could see that. You could clear from the angle of it, right? I'm just saying this from the physics. I'm not talking about judgment about a strip. Isn't that true that it was more this vision, not that vision of his nudity? I would disagree that it was only vertical. I think that when you watch, he does not just pull his pants out. He's pulling them down. And there's another officer who's shining a flashlight, which means there's some level of horizontal that makes this visible to the public. He's rather close. That flashlight seemed like it was rather close. I watched the video, too. First of all, I wasn't quite sure what I was seeing because it was kind of fast. But the officers were in front of him, and I thought one was shining the flashlight down like this. Yeah, it looked like to me it was down where the flashlight was down into the pants. I didn't see why there was sort of a distance like that. I'm not sure that we know where that flashlight's coming from because it's not the officer who's wearing the body camera doing the searching. It's someone else. Right, but the flashlight. So was the light. But anyway, that's. But I'm trying to prove your point. It was sort of a well-lit area. It was clear, well-lit. And we have to concede, and this will be the last thing before I sit down, thank you for the extra time, that this was a justified strip search. I think we concede that. However, a strip search was justified when they had a weapon, and it was in his underwear. Yes, we concede that it was a justified strip search. What we don't concede is that the manner in which it was done made it essentially constitutional. So we think, and I think the district court also. Give me at least 30 seconds to unpack that. You said that you concede that it was a justified strip search, but you don't concede that the manner in which it was what? The manner in which it was done made it constitutional. So there's four factors under the Bell factors, and the last one is was it justified or not. So to do a strip search, yes. I concede that. I think we have to. Give me one and two that you don't. You said three. Go ahead. The location favors the client, my client, because it was in public. Remember I told you, at least from my vision of it, and I guess our views will have something to say about that, it seemed like it was a downward flash into the pants and being as less intrusive as possible, not fall down to your ankles and anybody who's in the area can say, oh, there's a new man. I don't see how, at least from the angle of that, that someone from any distance away could actually see inside the pants. Because it was the officer that digged for a while to get it out. Man, that was a very dangerous situation. Was that gun loaded? Do you know? I believe it was. Good gracious of mine. That was the officer retrieving it. I suppose he had gotten the wrong end of the gun in getting it out. But no, the point is that it had to be dug out. The officer took a little bit. So go ahead. What's number two that you don't concede? The scope was significant. The scope of the search was significant. I think it's clear he's inside of his underwear. It takes him at least a minute to kind of work through that. But he told them where it was eventually. He said, I do have a gun, and it's in my underwear. Yes. The scope was limited to the underwear. Well, it was limited, but it still favors the defendant because of how intrusive it was. Who was intrusive is justified by the circumstances. What's number three? The manner in which it was done, Your Honor. That's the third factor. And we think that the manner in which this was done favors the defendant. Okay. And specifically, a very easy thing could have been done by the officer, which was to turn him around to protect Mr. Meyer's privacy. Thank you.  Mr. Kitchell. Thank you, Your Honor. Good morning. Good morning. I'm an assistant U.S. attorney in Charleston. I represent the government, obviously, in this case. And I listened with interest to y'all's discussion. And I think that the questions were well stated concerning what actually occurred. I think it's a very factually intense case in terms of how the officer handled the situation. And I think that the ---- Look, I want to start from the beginning. As they say in The Wizard of Oz, the movie says, it's always good to start from the beginning. Yes, sir. To me, in the context of it. I looked at the video. The officer made the stop. And the first thing he goes to, he said, well, you know, your taillights weren't on. Okay. Taillights weren't on. Citationable type offense. But then the whole conversation was, well, you guys having a good time this evening? Yeah. You know, at first I was thinking, like, officer, what do I got to do with it? I mean, invite me to citation. But then he goes on and starts asking questions like, yeah, well, what do y'all got in the car? Then I went, what occasion is this kind of conversation with them? I just want to understand. I think this is what our country is dealing with in an incredible way that we need to translate it through. Okay, he has a taillight out. Give him a citation. But the conversation, oh, yeah, how much time did you do in jail? Oh, was it crack cocaine? Or was it port-a-cord? And even the passengers, they're the most cooperative people I've ever seen. He said, yeah, yeah, I was on probation. I did those things. And then the man said, listen, I don't want to get shot here. He had a cell phone in his hand. He was willing to even put his hands at the top of the roof of a car. And the officer said, but he was concerned. The thing about it, the officer was concerned and safe. But the officer said, oh, no, no, put your hands down. You don't have to go that far. The officer told him. Yeah, it was so important for him to stand, but he was willing to do it. Because he said, I don't want to get killed. And the officer, I think they laughed about it. Unfortunately, I wish there was a laughing part in our country, but it's not. But, you know, and then all this conversation. When did he call it in? And his man told him he was on a suspended license, right? Yes, sir. And that's an arrestable offense. Yes, sir. Right? He could arrest him. But I just don't understand. How many minutes? Was it seven or eight minutes? From beginning to end, it was probably 11. Yeah. But why are some citizens beleaguered with all of these questions have nothing to do with the stop? It was one thing to say, you know, we saw some furtive activities. You were in a drug activity area. You stopped several times. People came up to your car. That's good police work because it's based on what you see, but not because of just two men in a car. And then all of a sudden you're going to have this diatribe about, well, what you got in the car. And then he told me, he said, listen, this is your last chance to tell me what you got. You got to be honest with me because don't come to me now. If I find it later and I get that. And then didn't they call a canine unit before that? Didn't they? I think I heard barking dogs in the background. Yes, sir. A canine officer. Barking dogs for a taillight out? Well, I mean, I'm just saying that's where we get in trouble. Nobody wants to deal with that. Yes, at the end, he had a gun. Yes, he did. Right. And we will deal with that in case of a question you have. But I'm talking about the beginning. It's the beginning that we have to look. What was the purpose of that? What do you think? Well, Your Honor, I think for the beginning events kind of show how things accelerated over time. The way the facts unfolded is it really was a routine stop. The officer saw that the taillight wasn't lit, pulled behind, turned on his blue lights, and then suspicious things started happening. Like what? Well, when he first pulled into the gas station, this is a major road at San Rittenberg Boulevard, and Mr. Moultrie pulled into the gas station, and he went through the whole parking lot, through some open spots that normally would have been where a driver would pull in to respond to the police. He pulled slowly all the way through, around the pumps, past the gas station itself, and then went over on the left side of the station by a dumpster. And during the course of the pulling, when the officer was behind the SUV, he noticed that both the passenger and the driver were moving about. And so that raised his concern, of course, as well. Moving about with his shoulders? That's all you could see? Head and shoulders? He saw movement. And officers are keyed in for legitimate concerns for safety. And when he finally got behind and kind of parked behind the SUV and got out of the car, his testimony was he normally tries to put people at ease to de-stress the situation. So when he first walked up, that's why I was asking, how are you all doing tonight, what have you all been doing? And he's trying to fulfill— He didn't ask them about what they got in the car? But that was after he started asking about, do you have a driver's license? And his interaction with Mr. Moultrie on the tape kind of shows strange things going on. When he spoke to Mr. Moultrie, who appeared to be cooperative, Mr. Moultrie was kind of acting in an unusual fashion. The defendant was also reaching down and grabbing bags, and the police officer— He was eating, wasn't he? Because he asked, what's in your mouth? He was eating. They'd just gone to think Taco Bell. Yeah. But, again, they're weighing in legitimate concerns about officer safety. So he sees movement towards the floorboard. And, of course, that makes the officer concerned. And Mr. Moultrie, the driver, is saying stuff about his driver's license. And so he gets a lot of papers from the defendant and kind of hands them to Officer Wyckoff. There's no driver's license in there because Mr. Moultrie doesn't have a driver's license. Well, he told him that. Ultimately. Then he reached back behind him and said, I think it's in the back. Then he reached back around and put his hand down in order to grab a water bottle and asked the officer if he could throw the water bottle out. And so, again, that's unusual. That's really weird. Officer, can you just sit here while I litter and throw a bottle out of the window? It was a little curious. And so because it's such an unusual behavior, that alerted the officer to make him a little more concerned. So there are other things going on when he's talking to Mr. Moultrie. He doesn't have a driver's license. He's getting ready to learn that he's suspended. And he thinks that there are weird things going on, not only because of what had just happened, but also, as I mentioned, how the driver and the passenger were moving about in the car. And the testimony was also from Officer Wyckoff that even after the SUV parked, the defendant was moving about in the car as well. So when there is movement, there is some suspicion and concern about officer safety. And so the officer is entitled to investigate the taillight violation. And in doing so, he can ask, of course, for the registration, the license, and the insurance for the car. And in the course of that, then run the wants and warrants. And during the course of that conversation, that's when that other information came out, where he's talking to them, trying to get all this information out. And the defendant is acting also, as I've mentioned, a little bit strangely because he too was nervous. Most people are nervous at a police stop. Didn't he say why he was nervous? What did he tell him? What did he tell him? The police officer? No, why did the defendant tell him why he was nervous? What was the reason for being nervous? He didn't. I don't think he really said he was nervous. He did. He said he didn't want to be killed. No, at one point he did say, I don't want to get shot. By whom? By the officer. And where do you think that nervousness came from? He saw the officer, I think, putting his hand and tucking it in his shirt. And the officer said, I saw you reaching down. You all are kind of shaky. I want you to keep your hands out. I just want to put them where I can see them. So, in other words, all of these things are justified to prolong the stop. He was actually not trying to prolong the stop. He doesn't have a driver's license. He's trying to find out because what often happens is when a driver can't drive because he's under suspension, oftentimes the police officer will let the passenger drive. So he's asking the passenger, the defendant in this case, Mr. Myers, whether or not he had a driver's license. And he said no. He told him no. Yes, or he said no. So that's the end of that inquiry. That's right. What's the next inquiry? And so because of the concern, he asks Mr. Moultrie to step out of the car. And when he stepped out of the car, walked to the back of the car. And, again, this is a lot. Were there other officers there at that time when he asked him to step out, the driver? I think the backup officer had arrived and then he got him out of the car because then he has more safety. Were the dogs there? I think the canine officer, Bradish, was the first to arrive. Right, he was first. He called the dog first. What was the purpose of the dog? He suspected because of what was going on that there might be narcotics involved. You haven't said anything about narcotics that we suspect. What is it about them that would suspect that they had drugs? Just tell the truth. What is it? What is it about it? Because all you talked about is they moved, they were eating something. They didn't. There was a suspended license. The taillight was out. I'm trying to list everything you said. Why does that equal they had drugs? Well, they have. To get a dog out. Just answer that question. I think that's a, he, the officer thought that there were drugs involved in the stop. Why? He thought there were. Why did he think they had drugs? I think that is a routine thing that the officers do. Is it routine that they had drugs? No, no, no. What is it about them that makes it routine that they had drugs? Again, and during the course of the stop, they had. We went through that. We went through every one of those. That's why I want to listen to every point. That's why I thought the beginning of this case is probably more important in terms of, I think, our nation understanding that. What made it equal that they had drugs? To the point you bring a dog in, they're the first one to get there. Well, there are two facts that I think that are of interest. One was mentioned in the order itself, and that is that there were four air fresheners hanging out in the window, or rather the mirror. And the case law there says the presence of air freshener can support reasonable suspicion because you're commonly used to mask the smell of narcotics. Did the officer say that? That was the basis for it? No, he did not say that. Oh, okay. But they're hanging there. Okay. And then the other thing is that the defendant. Do you know how many air fresheners they sell in the United States? About 50 cent apiece? Now, you got an idea? Yes, sir. Because I've got a case that you want to look at. We did some research on that. Oh, millions. Millions. Don't we talk about in terms of the Fourth Amendment what's the net? And part of our analysis is the likelihood that innocent conduct would be swept in the manner used in terms of determining the probabilities and the search and the interdiction of people in their normal course of life. That's the analysis of the Fourth Amendment, isn't it? You're talking about something that millions of people, double-digit, maybe triple. You know, I tell my daughters, I said, listen, they have one. I tell her, I said, listen, you better take that out of your car. And she said, well, I'm trying to keep it. No, believe me. Trust Dad. Take that out of the car because it puts you in a category. But in this case, there wasn't just one hanging, which is what you often see. There were four hanging, which is a lot it seems to me. I understand. And then the officer had also learned from the defendant that he was on probation for a narcotics offense. Which he honestly told him. He did? He honestly told him. Actually. You get no credit for honesty at all. He kept saying, well, I'll be honest with you. They're the most honest people I've ever seen in my life. Actually, he was on supervision for a heroin conviction in federal court. Okay. Okay. All right. People self-medicate. Yeah, they do. A lot of people self-medicate. You know what I mean? But here in this case, it's a little bit different because the defendant told the officer that he had been in jail for six years on a seven-year offense. It was six years probation. And so in South Carolina, that's a long time to get a jail sentence for in prison for a drug offense. And so, I mean, we're trying to – So, otherwise, what he meant, it must have been trafficking. Yes, sir. I think the way he does that. So, I think all these things go in the officer's calculation as to what he does. And, of course, there is a concern for officer safety. And so that's why things progress as they did. And he had Mr. Moultrie step out. And then as soon as he did that, almost immediately – Oh, yeah. I'll let you off the hook. I just wanted to hear that because I think that's really – it won't get answered in this case. And maybe not your lifetime or mine, but it's one that I think is a pressing and existential question. But go ahead. You can just argue the law now for the rest. But I think that is a concern because this case shows that there's a tension. There's a need to balance the interest of the police to protect themselves from harm and also the interest of the public to be safe from undue harassment. And I think in this case it shows that Officer Wyckoff actually went beyond what may normally occur because of how he parsed through the different events as they occurred. I think that we can concede, based on the facts, that the officer had a right to detain all the individuals in the car based on Arizona v. Johnson. There was a presumption to seize everybody while all the normal paperwork processes were done. They checked once in warrants. And so I think that the defendant asking to get out of the car is something that the officer had a right to deny him that request. So the second question is, excuse me, what about the search that was conducted? And I think given the information that we've already kind of gone through, the officer actually did have sufficient information, a probable cause, to believe that there was contraband or evidence of crime in the possession of the defendant. And he reacts as soon as he hears it, as you can hear on the video, in response to that information rather quickly. But I think that based on all those facts and the tip contemporaneously given by a face-to-face person who may suffer harm or consequences because of revealing that information, there is probable cause to believe that the defendant was in possession of a weapon. Mr. Moultrie also whispered to him or told him that the firearm was in the defendant's pocket. And so that kind of plays out down the road when the officer deals personally and specifically with Mr. Myers. So based on that information, Officer Wyckoff walks over to the driver's side where the door is open,  and I think Officer Bradish knew that because he'd heard the Officer Wyckoff say there was a gun, he knew there was a gun, but I don't think Officer Beaver may have known there was a gun based on the testimony. And so what Officer Wyckoff did was that he tried to alert the other officers that something unusual was going on, so he asked Mr. Myers to put his hands on his head while he sat there, and then he walked around. And that's when the initial frisk took place. And it was really a continuous search, a frisk, I think you can qualify it as, because it really wasn't initially intrusive. That was only after the officer felt the butt of the gun. When the officers were standing by the car with the defendant, when Mr. Myers got out of the car, they did a quick pat down, I think, of the waist area and did lift up the shirt. And then because there was a safety issue, and because Officer Wyckoff thought there was a problem with how things were unfolding, in that the defendant still had his hands on his head, and therefore had freedom of movement of his hands, Officer Wyckoff wanted to take over the frisk and detain the defendant. So he did that. That's when he cuffed Mr. Myers. And then after he cuffed him, the first place it looked like that he went in the testimony shows that he went was to the pocket where he'd heard the gun was. And there was a folded up heroin in the little watch pocket side of the jeans. He pulled that out and talked about whether it was cocaine or not. And then the officer was showing his care. Instead of just doing a complete frisk and completing what he'd started, he asked Officer Beaver to shine a flashlight under the seat where the defendant had been sitting because he thought he'd been reaching under there. Maybe that's where the gun was if it wasn't in the pocket. And as soon as that was a negative result, he then started doing the rest of his pat-down. And you can see on the video that he first goes down to the legs, and then he reaches up, as Your Honor said, to the groin area. And then he felt the gun. And as soon as he felt the gun, of course, he said, there it is. And then the defendant said, kind of acknowledged that that was the case. And then the search began. And that's what the court said. There was obviously a problem of cause to go and do a more intrusive search and go into the clothing. And so in the course of that, that's when the gun was finally recovered. The officer did not actually go into the underwear of the defendant until the defendant told the officer that the gun was in his drawers. And so that's when the officer went there. And the court noted that the search was narrowly tailored, that the officer was very considerate of the defendant's privacy, and that he was protecting what he was doing from public view and, in fact, as you noted, Your Honor, that he pulled the pants out. And the defendant was wearing three layers of clothes, so it was obviously difficult to get to where the gun was. But he pulled the pants out in order to look in and see whether or not there was a gun there. So it was the most reasonable way to do it in the least intrusive fashion in trying to find the weapon itself. And, again, the paramount issue is officer safety. And I think that the officer balanced the needs of the community in trying to protect the rights from being overly intrusive and also in protecting his safety. And it shows that, indeed, there was a safety issue because the gun was there. Are there any other questions? Thank you for your time. I respectfully request that you affirm the rule of court below. Thank you, counsel. Mr. Grober, do you have time? Thank you, Your Honor. I want to start and make sure that the court understands my position on the strip search being unreasonable. It was justified that a strip search was done, but the court still needs to go through the analysis looking at the other three bell factors. This court decided, and I know Judge Diaz dissented in it, but it was U.S. v. Edwards where the officers used a knife to cut off drugs from a defendant's penis. The court ruled that that was a justified strip search, but, however, the scope, the manner that the officer went through it made it an unreasonable and unconstitutional search. And because of the facts in this case, which we believe that he was exposed to the public and to the other officers on the scene, that that is why this is an unreasonable search in this case. Well, tell us why in Edwards, the facts in Edwards would apply in your case here. They went too far, even though it was justified. Yeah. But you set that up quite well. You framed it. Now tell us why it wasn't a distinctive fact. You made it infirm in Edwards, and like you suggested, it's infirm here. I think that it has to do with, again, the exposure of Mr. Myers. And what we view is, I'm watching the video, that he was exposed to a very well-lit gas station. And this is not on the side of a dark road. This is in a well-lit area. He has a flashlight trained upon his private area, and he is exposed. And so we think that is significant. All strip searches where touching and searching within the underwear are significant in scope. So what do you think required some level of asportation, move to some other place that was more secretive? We think the solution in this case was very simple, to turn him around. The officers had already moved Mr. Myers very limitedly in turning him when they knew he had the gun, and that they could have done that to protect his privacy as well in this case. And that would have been very easy, very simple, and reasonable. It would have made the manner in which this was done more reasonable. I want to ask the court to consider some hypos when it comes to whether or not a passenger is free to leave a traffic stop. And if two women had pulled up to the gas station, and one of them had asked to step out and go to the bathroom, or one of them had asked to go shopping at the store, we think that that person should be allowed to leave, because there's no reason to keep the passenger there. If I'm with my Uber driver on the way to the airport, and my Uber driver gets a speeding ticket, and I have to catch my flight, would it be reasonable that I have to stay there until the traffic stop is done, or could I catch another Uber? We think that I should be allowed to catch another Uber. Finally, we think, Your Honor, that this case really is about officer safety, but that you cannot fix the issue of officer safety by stripping away the precious rights of the Fourth Amendment. Thank you. Thank you.
judges: Roger L. Gregory, Allyson K. Duncan, Albert Diaz